The first case on that calendar, City of Providence v. Batts Global Markets. May it please the Court, Joseph Daly for the Institutional Investor Plaintiff Appellants. Your Honors, given the relatively short amount of time I have this morning, or this afternoon, I'd like to focus on just one of the three manipulative devices that we've alleged in this case, and that is the complex order types. I think that's a good vehicle to explore the District Court's errors regarding manipulation, aiding and abetting liability, and absolute immunity. And as I do so, I would ask the Court to please turn to the Joint Appendix at page 296 through 299, paragraphs 152 through 156, where we describe a certain type of complex order type called the Hide and Light Orders. Now, in layperson's terms, the exchange has designed this mechanism so that... So, what was the page number again? It's Joint Appendix page 296 through Joint Appendix 299. The exchange has designed this particular complex order type so that its favored clients, the HFT firms, could actually remain hidden in the background as my clients place their ordinary limit orders on the exchange, and then when the price reached a certain trigger point, the HFT firms would get to jump ahead of my clients and take the trade that was supposed to go to my clients. Now, this is paradigmatic market manipulation. This Court has said that in order to plead a satisfactory market manipulation... You're arguing here that there's a manipulation. This is very different from the usual case because you're... I don't think you can point to any deception here. I think everybody knew what was happening. The SEC had approved it, the exchanges were doing it, they were completely open about all of this. So, where is the violation of 10b-5? I don't... With respect, Your Honor, there was deception and we have pleaded and we've discussed at length in our briefs that even the SEC was unaware of some of these complex order types. They were either not just... The individual order types. Exactly. Yeah, well, not... I mean, they had delegated that authority. So, not each order type was submitted to the SEC for approval. But the SEC even fined the exchanges several million dollars for not disclosing some of these complex... So, that's what your case is. On the order types, on the fraud there, that's what your case is. That is one small part of the overarching scheme that we've alleged. Here we have a situation where you're going after the exchanges who have, you know, done all of this and in your view, they favor, they definitely favor the high-frequency traders. But all of the favoritism that you point to as a general matter was known, disclosed, approved by the SEC, part of the NSM rules. And therefore, I just have... This is an unusual case, that's all. Maybe there's an artifice to the fraud that doesn't require a material omission. Is that what you're claiming? No, and I want to back up just one minute to what you said. Again, that is incorrect to say there was no deception here that everybody knew what was going on. We've alleged that these complex order types, in combination with the proprietary data feeds and the co-location devices, together that formed a bundle of manipulative behavior that our clients certainly didn't know about. I mean, who would roll dice? Well, didn't they... Wouldn't discovery pretty quickly discern that everybody knew that the high-frequency traders got there early and were able to... Figure out how to jump in ahead and then make their moves. And that would happen before you could trade. Now, that was all understood and known by the proprietary, by the co-location. That's all part of it, right? No, not right. Incorrect, Your Honor, because again, the market was aware, of course, that the co-location services existed. The market, of course, was aware that the proprietary data feeds existed. What the market did not know, for example, when they came in to set a limit order on a particular thousand shares of a particular stock, they did not know that the exchanges had created this complex order type, allowing an HFT firm to slide in, hidden, and suddenly light on that order and take the very order that my clients had wanted to place. Now, that's paradigmatic securities fraud. That's manipulation. That's, as this Court has said, that is affecting the market activity for the stock. So if the case was just the proprietary feeds and the co-locations, then you wouldn't be able to bring a 10-D5? I don't know if I want to concede that, but luckily the case is not just that. No, it isn't. But then you're asking partly for injunctive relief here. Pardon? Say that again, please? You're asking for injunctive relief? Yes, that's part of it. The larger remedy that we want... Suppose we were to bar the complex order types or require them to be fully disclosed to everyone before they were utilized. That would satisfy you and that case would go away? No, because we still need to be compensated for the market manipulation that went on from April 2009 up until at least November 2014, the filing of the operative complaint here. Okay. Go ahead. One thing that the exchanges try to do is say that... They point the finger at the HFT traders. They say that in order to have market manipulation, you need to have had the trades. And they point the finger at the HFT firms. They say, we haven't done anything here. Well, that's not quite correct. The HFT firms could not do any of what they did, the hide-and-slide orders, the hide-and-light orders, the spoofing, the layering. They could not have done any of that without the mechanisms that these exchanges created, designed, marketed, and sold for hundreds of millions of dollars. It's as if the... No, I understand what you're saying. Sure. You're saying this is not a case where they provide the tools, the exchange, and so forth that are then abused by the trader. You're saying here that they are effectively providing the manipulative device. Exactly. Themselves. And everybody's involved in... I think there's sort of this artificial separation that exchanges try to construct in this case between themselves and the HFT firms. But they are all in it together. It's an overarching scheme, which, as we've alleged in several paragraphs in the complaint, that overarching scheme affected the market price of securities on the exchanges. Our clients paid more for securities that they tried to buy. Aren't order types, how orders are done, isn't that classically a regulatory issue that's subject to the SEC's review and authority? And isn't the very fact that the SEC said, well, you didn't tell us about this, so we're going to look into these complex order types, doesn't that indicate that it is a regulatory matter within the SEC's regulatory authority? The complex order types are allowed by the SEC, but the undisclosed nature of them, the undisclosed facets of them that make them misleading are not allowed by the SEC. When the SEC is fortunate enough to discover some of that going on, that's when they assess civil penalties. So once you say the complex order types are allowed by the SEC as a regulatory matter, why then doesn't the immunity attach? Because for these particular complex order types, and I see I'm going through a rebuttal time. No, no, not particular complex order types. Complex order types. Why then isn't that subject exclusively of the SEC's review? And why doesn't that render these changes at least with respect to those order types? If I can make an analogy, and it's made in the brief, the SEC also has absolute regulatory authority over the filing of 10-Ks and 10-Qs. But just because the SEC has regulatory authority over that does not mean that we as private attorneys... Did either side, to your knowledge, seek the views of the SEC or seek to solicit the SEC as an amicus? I didn't hear the first part of your question. Did either side, or did you, seek to get the SEC involved in this case? Not that I'm aware of, Your Honor. Would it be helpful? Would it be helpful to have the views of the SEC? Well, the SEC certainly knows that some of this is going on. As I said, on occasion they've reached down and gone after these people. But the SEC cannot do what we can do as private attorneys general. We understand that, but that's not the question. The question is whether these legal questions, whether our review of them would be informed in a helpful way by the views of the SEC. Well, some of those views of the SEC are in our brief where we have SEC commissioners talking about... Like one individual. No, talking, talking, yes. Commissioner Gallagher and I believe Aguilar. Aguilar, yes. We're not interested in talking. We're interested, if at all, in the formal views of the SEC. On this case. We would be open to that, I imagine, as long as that did not prevent us from, again, seeking compensation for the wrongs that occurred... Well, it would really be directed at the jurisdiction on immunity questions. Not so much the violation of 10b-5. Well, I think this Court has answered that question on the absolute immunity front. This Court has said that are the activities, are the alleged activities that are at issue, are those the sort of activities that, in other circumstances, would have been performed by a government agency? And it just boggles the mind to think that the SEC would create a hidden, nondisclosed complex order type that was marketed only to certain traders in the United States. If they were to reply, then, that that particular complex order type are not part of their regulatory function, they don't care that that's something that's independent, the exchange cooked this up to make money so there'd be more trading for them, to benefit them with their commissions, that would be one view. But they would comment on this. Or they might say, no, this is complex order types of standard regulatory affair. Who knows? Right, but we don't know. And that, of course, it's the former comment that we would agree with, and the latter comment, I suppose, we would disagree with, and we would certainly find... We figure that one out. And we wouldn't necessarily think that would be binding upon this court. I mean, we'd have to see how much deference... No, no, no, we're not saying anything's binding. All right. We're looking for help, that's all. And we appreciate your brief, and we appreciate your adversary's brief, but sometimes another perspective can be helpful. Exactly. It's not uncommon for us to request a government agency that has regulatory, general regulatory authority in the area to comment. All right, I'd like to reserve the rest of my time. Sure. Thank you. Good afternoon, Your Honors. My name is Douglas Cox. I represent the NASDAQ defendants. I'll be presenting argument today on behalf of all of the exchanges. The court's question has already drawn out that the activities challenged here are part of the exchange's regulatory responsibility to manage how data is delivered and how orders are executed. Is your adversary correct... Well, is your adversary correct that, at least it's alleged, the SEC was unaware of several of these complex order types? To be very precise, Your Honor, the order types are part of the exchange rule. They must be approved by the SEC. The SEC must make a finding that they are consistent with the public interest. They are published and they're available. What if an exchange, I guess this is the question, permits or authorizes or otherwise helps these HFTs to engage in complex order types that are unknown to the SEC? Would you acknowledge that that would be a problem? That would be a violation of the exchange's obligation to comply with its own rules and the Exchange Act. That would be a problem. And the SEC has authority over that. And so, Your Honor, your question already suggested what I think is the correct answer to my colleague's observation, which is the fact that there are individual instances where an exchange in the SEC's view didn't fully disclose and the SEC comes in and imposes a sanction. What if it's a category of complex order types? An entire category? Your Honor, as I say, all the order types are rules of the exchanges.  And if the exchanges aren't doing that... I know you're flipping my hypothetical. Well, no, Your Honor, what I... So if they are not submitted and for whatever reason the exchanges allow certain types of complex order types, complex orders, to be undertaken by these high-frequency traders, then what? Then, Your Honor... Then would you acknowledge that there's a problem? Your Honor, there is a problem that is given to the SEC to address. The SEC is the one who has structured the market. The SEC, subject to what Congress said in the Exchange Act, when it authorized the national market system, has said to the exchanges, you can do these things, but you must give them to us, we must be able to look at them, we must make our finding that it's in the public interest. So if what you are hypothesizing, Your Honor... So what you're saying then is that we... that's a subject matter jurisdiction issue. It is in part a subject matter jurisdiction issue. Also an immunity issue. Also an immunity issue, but also, Your Honor, I think it's also part of the 10b-5 enactment. Well, it doesn't mean that they preempt. I mean, very often the SEC can bring an action, private parties bring actions, the government can bring a criminal action, there are all sorts of... in enforcing the securities laws, all of these things can happen at once. That's right, Your Honor. It is important to recognize that all of these activities, that my colleague challenges, have been published to the SEC, have been approved, there is a finding. If you have a rogue exchange, the Exchange Act contemplates that there is a different mechanism other than private suits to deal with that. So let me go back, Your Honor. You did mention... Let me ask you just to follow up on the question you asked your adversary about requesting a submission of an amicus brief in effect from the SEC. Is there any problem with that? Your Honor, it's unnecessary. You know what the SEC thinks because you have in front of you Reg NMS, which talks about all of this, and you also have in front of you the SEC's statement in the equity market structure release where they go on at length about co-location, technological change in the markets, and the activities of the... Whatever the SEC says in Reg NMS, which I've asked my clerk to print out, and it's about the size of a telephone book, is not specifically directed at this case. We're looking for help in this particular case. Your Honor, it does pre-exist this case. We do have competing peers here. But what I am suggesting is the SEC knows, as my colleague concedes, about these issues. And in the equity market concept release... He doesn't concede all of that, yeah. But in the equity market concept release, the SEC talks about high-frequency traders. Yeah. And it says some people are concerned about that. And here's how we're resolving it. We, the SEC, the people who are charged with this issue... So, when you go back to your point, Your Honor, about the three arguments, jurisdiction, immunity, 10b-5, for the plaintiffs to prevail, you have to conclude that the SEC has gotten the market wrong time after time after time. They say that in the complaint. They say that the SEC rules don't go far enough. They say that the SEC doesn't understand HFT. They ask, as part of their relief, that the courts step in and change the timing requirements for the disclosure of data. So, just to follow up on Judge Walker's question, wouldn't it be helpful for you if the SEC were to submit, as an amicus brief, a response that said, we were aware of all this, consistent with Reg NMS, consistent with the statements that we made to the Federal Register and so on? Wouldn't that be helpful? You say it's unnecessary, but wouldn't it be helpful? Well, Your Honor, it's not as important as whether or not it's helpful. I think you already know what the SEC's views are because they've expressed them. That's all I'm saying. Let me turn to the jurisdictional point, Your Honor, which you mentioned. Again, I think the discussion so far illuminates it. Congress, in the Exchange Act, said, if you are agreed by what the SEC has done, you are to take it to a Court of Appeals, not to a district court. My colleague here, as you can tell from the complaint, he thinks the SEC has bungled setting up the market and the regulation of the SROs. So, the Exchange Act quite clearly says in 78Y, that goes to a Court of Appeals. Part of the theory of the case, as I understand it, is that the exchanges are in cahoots with these high-frequency traders as part of this manipulative process of activity. Why isn't that sort of an ordinary 10b-5 case as alleged? Because, Your Honor, Congress made a different decision. It says, specifically in 78Y, if you are agreed by an SEC order or by an SEC rule, you are to take it to the Court of Appeals. Is everything that the exchange or an exchange does subject to SEC review? Everything here, Your Honor. Well, the other problem that you have here is the fact that the exchanges are not simply public servants. They are earning huge amounts of money from the commissions on these trades and the high-frequency trades now dominate the market in a way they didn't 10 years ago and all of this is inherent to the benefit of the exchanges and we have the Weissman case which says dealing with qualified immunity with immunity here, when an SRO is not performing a purely regulatory function adjudicating or prosecutorial function, but rather acting in its own interest as a private entity, absolute immunity doesn't obtain. Now that's a case that says that if it's mixed if it's mixed, it's not purely regulatory, then there's no immunity. Now at least that's a possible reading and, you know, a little bit of regulatory doesn't necessarily get you immunity if it's a mixed bag, it seems to me and so if we analyze this whole case as to whether or not there is a private proprietary interest that the exchanges have in promoting the high-frequency trading then under Weissman a reading of Weissman there's no immunity, right? Your Honor, if I could make three points. Go ahead. For starters, Congress in the Exchange Act specifically made a finding that competition between the exchanges was in the public interest and so what you see in the pursuit of HFT and order flow is competition among the exchanges the way Congress wanted it, that's also in the rank, that's number one. Number two, Your Honor, it isn't the case that if it's mixed motive there's no immunity. The court below stated, and my colleagues concede on appeal that the standard is that the exchanges are commercial and have nothing to do with the function of the market and none of these three elements. Well, I don't read that in the language from Weissman. Maybe Weissman's not, it's the 11th Circuit, we're not bound in any way by it blah, blah, blah, but still, it's loose language. Take a look at the district court's opinion in my colleague's brief at 40, but also my final point, Your Honor, would be that you're exactly right in this circuit, Weissman says, we're not going to follow the second circuit, it says it in so many words. This circuit, in specialists said that if there are allegations that involve action or inaction with respect to trading on the exchanges then the exchanges are immune. And that's what we clearly have here, it's indisputable that all of these things involve trading on the exchanges. Your Honor, my time is about to run out, I do want to touch on two quick points about the 10b-5. For starters, you've already drawn out the question about is there any manipulative fact, we know it's virtually a term of art. Market activity deceiving investors, how the market participants have value security, that's from ATSI, Your Honor, we don't have that here. If I can just complete my thought, Your Honor. No, sure, sure. The other point, again, as the district court found below is that the most the plaintiffs have here is an aiding and abetting allegation where you'd recognize this 10b-5 claim, you would expand aiding and abetting, and the Supreme Court has said in Stone Ridge that's not for the courts to do. Look at my colleague's reply brief at 20, they say the SEC may have generally allowed proprietary data feeds, co-location, and order types. It certainly hasn't proved their use in a manipulative manner. My question is, who uses them? The HFT firm. So let me ask another question in terms of 10b-5. Normally an omission of material fact is part of it. Here we don't seem to be dealing with that with the exception of the special order types that your adversary referred to, but when there's a high speed trading and one firm gets the information on a proprietary feed in advance of the pension funds here, the normal traders, doesn't that person then deny material information for a split second that he should get and just because of the speed, and secondly, do the proprietary feeds also in addition to enabling earlier trades also contain different information, more than the normal consolidated feed? Yes, your honor, it does, because again Why aren't those material omissions from the perspective of the plaintiff here? Well, for three reasons, your honor. For purposes of this case, this is not an omissions case, they've only played a manipulation case and they've conceded that. In terms of the way the market is structured, your honor, Congress said, we want there to be the consolidated feed. You can find that in 78 K-1C. But 78 K-1C also says, we understand there's going to be another feed. A different feed that's not the consolidated feed. And we, Congress, want that. And so the SEC and Reg NMS have said, yes, there can be these competing feeds. And in that second set of feeds, what you call the proprietary feeds, those are things that Congress anticipated that the SEC approves. The SEC also knows and has said that information from a processor through the consolidated feed reaches market participants later than information from exchanges' proprietary feeds. Am I correct that the SEC, and I think that this is a public thing that I've read somewhere, was at least at some point engaged in an investigation of high frequency trading? Your honor, is that correct, first of all? I believe it is in several respects. Yes, your honor. I think in our brief, we point out that there's one instance when they found a high frequency trading firm was manipulating the closing price, so the SEC went and got them. Secondly, your honor, the SEC clearly, again, when you go back to the equity market structure release, as I say, they discussed all of these issues. HFT, co-location, timing disadvantages, and they make their decision about how they're going to exercise the authority Congress gave them. My last point, your honor, unless the court has more questions, is with respect to the complex order types, we've been kicking that around a little bit, I think it's important to notice that not only are they approved by the SEC, not only are they published as exchange rules, it's also the case that some of these complex order types are required by Reg NMS itself in order to avoid locked and crossed markets. The SEC itself has introduced types of complex order types, and the SEC remains aware of the issues involved in complex order types. The panel has no more questions. Thank you. Two very quick points, your honors. The first is the more important of the two. There was a lot of talk up here just now about how the complex order types were disclosed to the SEC, the SEC knows about them, put its informatter on them, etc., etc. That is not true. We have alleged in the complaint, and I'm just picking out one paragraph, at Joint Appendix page 293, paragraph 143, that the rule descriptions of the complex order types did not match what was going on, that the exchanges failed to include information about how those order types worked in the regulatory filings, or they failed to make the filings altogether. Now, counsel may not like that fact. Can we consider all of the other material in the appendix that suggests that the SEC was aware generally of these complex order types, categorically? Of course you can, your honor, but here's my point. We've alleged at that paragraph, paragraph 143, and several other paragraphs, we've alleged that the SEC was not told of certain of these complex order types. So why isn't that a regulatory failure? Why isn't that a failure to comply with the regulation in an area that, for which the SEC can seek a remedy? Well, the SEC can always seek a remedy, but... But it goes to the question of whether it's regulatory or not. That's the question. If it's regulatory, then there's immunity. And that's what... If it's regulatory in that it is something that the SEC would be doing in the stead of the exchanges, I would agree. But the SEC is not going to come in and construct these complex, secretive order types... No, but it can... But the idea, the point, I think, is that it can come in and say either you can't engage in these complex order types, or you can, but we're going to do whatever, X, Y, or Z. So the fact that it doesn't know about a discrete type of complex order types doesn't mean that it's not regulatory. But the question is not necessarily whether it is... I mean, the SEC can regulate all of this. Of course they can. They can regulate false and misleading statements in a registration statement. The fact that they can regulate that, though, does not give the exchanges carte blanche to say, we deserve absolute immunity because as we step into the SEC's shoes, we would be allowed to make material omissions, make false statements, and engage in manipulative behavior. That's the difference there. Of course the SEC has regulatory jurisdiction over all of this. They have regulatory jurisdiction over the exchanges through the rulemaking process. That doesn't give the subject of that rulemaking process the freedom to actually perpetrate schemes and manipulative devices. But isn't the answer, part of the answer to this that the SEC, if there were no exchanges, or exchanges were not dealing in these areas, that the SEC could propound regulations, promulgate regulations that would accommodate these problems. Right, but they would be violating their own rules, however, if some of the devices that they constructed for the investing public were kept undisclosed. That doesn't mean it's not regulatory, does it? I mean, so they could change their rules. I mean, this is all part of... Or Congress can make them change the rules. Or Congress can change the rules. But again, I'm going to harken back to what this Court has said in several prior cases on this subject, and that is, an SRO like the exchanges, they are only protected under absolute immunity if the function that they are being charged with is the function that the SEC itself would be doing. And as I said, the SEC wouldn't be setting up... Do you agree that if it's... if there is a regulatory aspect to it, then there is immunity even though there's going to be by the exchanges? No, I disagree with that, Your Honor. As I said, and I'm sorry, I sound like a broken record, I realize, but there's a regulatory aspect over everything that both the exchanges and my clients do. I mean, we're all operating underneath. I understand that. But the fact that the exchanges... What's the most you can make of the fact that the exchanges are making money on these trades? We've already conceded in our briefs that the profit motive of the exchanges is irrelevant. It's irrelevant, but on the other hand, on assessing whether there's regulatory... whether there's immunity, one has to look at whether there's a regulatory aspect or a commercial aspect. Well, but the regulatory aspect here, I mean, the SEC regulation NMS has already set up a consolidated fee. That is, as the SEC says, at the heart of the market. That is at the core of what goes on. These other devices, the co-location and the proprietary data fees, those are far removed from what the SEC says that the average investor on the market deserves to get fair and efficient prices across the exchanges at the same time. Except that the SEC in a release specifically talks about co-location services. I'm having trouble understanding how you can divorce the fact that the SEC specifically mentions co-location services, specifically mentions proprietary fees, specifically mentions complex order types categorically. Categorically. Categorically. But you're then asking us to say that, in fact, this is the exchanges engaging in a frolic and a detour. But what you won't see, Your Honor, is the SEC issuing a release explaining how it is approved... Those three factors working in tandem. So your point is that the SEC must very specifically approve everything that the exchanges do in order for the exchanges to enjoy and... No, I'm not saying that, but I am giving the counter to the idea that just because the SEC happens to mention a certain type of complex order type in a release, that that then gives the exchanges carte blanche to construct hidden scheme-like complex order types. Again, remember, the SEC also discusses what is required in a prospectus or registration statement. That doesn't give the issuers issuing that registration statement freedom to include falses in that document. Thanks, Mr. Taylor. We'll use our decision.